## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                    :

SHEILA C.[1],                :           24-CV-00002 (RMS)
*Plaintiff,*          :
                    :

V.                      :
                    :

MARTIN O'MALLEY,    :
COMMISSIONER OF SOCIAL  :
SECURITY,            :
*Defendant.*         :
                    :           JANUARY 3, 2025
------------------------------------------------------- x

## <u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This is an administrative appeal following the denial of the plaintiff's applications for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") and supplemental security income benefits ("SSI") under Title XVI of the Act. It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22-CV-00026 (VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023). *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining, in a Social Security case, that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI").

The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner").  (*See* Doc. No. 18).  In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings.  (*Id.*).  The Commissioner, in turn, has moved for an order affirming her decision.  (*See* Doc No. 20).

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **DENIED**, and the Commissioner's motion for an order affirming that decision is **GRANTED**.

## I.    <u>PROCEDURAL HISTORY</u>

On August 13, 2021, the plaintiff filed concurrent applications for both DIB and SSI benefits claiming that she had been disabled since August 29, 2020.  (*See* Doc. No. 13 (Certified Transcript of Administrative Proceedings, dated February 5, 2024 ("Tr.")) at 186-204).  The plaintiff's applications were denied initially on December 9, 2021, and again upon reconsideration on March 1, 2022.  (Tr. 69-70, 85-86).  On September 27, 2022, Administrative Law Judge ("ALJ") Alexander Peter Borré held a hearing at which the plaintiff and a vocational expert testified.  (Tr. 34-68).[3]  On December 5, 2022, the ALJ issued an unfavorable decision denying the plaintiff both DIB and SSI benefits.  (Tr. 14-33).  On November 3, 2022, the Appeals Council denied the plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

On January 2, 2024, the plaintiff filed the Complaint in this pending action.  (Doc. No. 1). On January 17, 2024, the plaintiff filed a Notice indicating that she consents to a United States Magistrate Judge's jurisdiction over this matter, including the entry of a final judgment.  (Doc. No. 11).  The following day, this matter was transferred to the undersigned.  (Doc. No. 12).  On May

---

[3] The ALJ held the hearing via videoconference due to the circumstances presented by the COVID-19 pandemic.  (Tr. 17).

1, 2024, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 18), along with a supporting memorandum (Doc. No. 18-1) and a Statement of Material Facts.  (Doc. No. 18-2).  On May 29, 2024, the Commissioner filed his Motion to Affirm (Doc. No. 20), along with his own supporting memorandum.  (Doc. No. 20-1).  The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The medical records demonstrate that the plaintiff suffers from the following relevant physical conditions: multilevel degenerative spinal arthropathy, peripheral neuropathy, paresthesia, hypothyroidism, transverse myelitis, cirrhosis, ascites, and general weakness and pain. The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing.  (*See* Doc. No. 18-2 at 1-17; Doc. No. 20-1 at 4-9). The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

On September 27, 2022, the plaintiff appeared via videoconference for a hearing before the ALJ regarding this disability application.  (*See* Tr. 34-68).  At the hearing, the plaintiff explained that her symptoms began suddenly one day in August 2020 when she experienced nausea and significant vomiting.  (Tr. 54-55).  After that day, she began feeling chest pains and a sensation of tingling and tightness in her legs and hands, which prompted her to go to the emergency room. (Tr. 55).  The plaintiff testified that she was sent home because the physicians in the emergency room were unable to determine the cause of her symptoms.  (*Id.*).  As her symptoms worsened, she returned to the emergency room several times, but each time she was sent home without a diagnosis despite repeated testing.  (*Id.*).

The plaintiff testified that since August 2020, she had lost 47 pounds, which she attributed to the sensation of tightness in her chest which made it difficult for her to eat.  (Tr. 40-41).  The

3

plaintiff explained that she could not drive because the numbness and pain she was feeling affected her chest and continued through to her hands and feet.  (Tr. 42).  She described how she did not have any strength because she lacked feeling in her hands and legs, such that she could not decipher her speed or the strength of her grip.  (*Id.*).  As a result, her husband or one of her children would drive her because she could not drive herself.  (*Id.*).

Next, the ALJ asked the plaintiff about her education and work history.  The plaintiff stated that she had an associate degree as a Medical Dental Office Specialist.  (*Id.*).  Beginning in 2007, the plaintiff worked as an administrative assistant for Cornerstone Real Estate Advisors.  (Tr. 42-43).  Subsequently, the plaintiff held a temporary position as a database controller for an engineer for Kelly Services.  (Tr. 43).  Then, the plaintiff had a similar temporary position performing database work for J. Morrissey.  (*Id.*).  Finally, the plaintiff most recently had a temporary position with Randstad as a case manager for Care 4 Kids the United Way, where she processed applications for the Care 4 Kids program.  (Tr. 44).  The plaintiff testified that her employment with Randstad terminated because of circumstances related to the COVID-19 pandemic.  (*Id.*).  Specifically, the plaintiff stated that her employer did not hire her as a permanent employee because it generally reduced its number of employees during the pandemic, and her employer limited the number of people who could work closely together.  (*Id.*).

The ALJ then asked the plaintiff why she felt that she could no longer work.  (*Id.*).  The plaintiff explained that she did not have strength in her hands, that they felt swollen, and that she could barely move them.  (*Id.*).  She stated that, because of her inability to move her hands, she would injure herself, such as sustaining burns and cuts to her hands.  (Tr. 44-45).  She described the sensation in her hands as very swollen, although they did not visually appear swollen, such that it was painful to move or open a jar, for example.  (Tr. 45).  When the ALJ asked if the plaintiff

was taking any medications, the plaintiff answered that she was prescribed gabapentin and baclofen, which had not effectively reduced her pain. (*Id.*). The plaintiff testified that the pain was impacting her ability to sleep because sleeping on either her hands or legs would cause her to wake up feeling numb. (Tr. 45-46).

The ALJ subsequently inquired about the plaintiff's diagnosis. (Tr. 46). The plaintiff described the difficulties she faced in obtaining a specific diagnosis. The plaintiff testified that at one point, she lost all feeling in her legs and could not walk. (Tr. 55). Consequently, the plaintiff was hospitalized for one month during which she needed a wheelchair. (Tr. 56). During this time, the plaintiff's pain was so unmanageable that each time she tried to get up, she would fall. (Tr. 57). Because the plaintiff still did not have a diagnosis, these symptoms prompted her to seek treatment and further testing at the University of Connecticut. (Tr. 55). The plaintiff then saw a rheumatologist and neurologist back and forth for a year and a half, until she began seeing a new doctor, Dr. Imitola, at the University of Connecticut in 2022. (Tr. 46, 55). The plaintiff stated that Dr. Imitola diagnosed her with transverse myelitis because there was inflammation in her spine, and her symptoms presented "like a belt around the chest." (Tr. 55-56).

Because her medications had not been effective, and her symptoms continued to worsen each day, the plaintiff opted to seek treatment at the Yale Neuromuscular Clinic for a second opinion. (Tr. 46, 56). After two appointments, the physicians at Yale told the plaintiff that she had inflammation in her spinal cord, but then questioned the diagnosis and ordered more testing the following month. (Tr. 46). When the ALJ asked about one of the physicians mentioning "MS" or multiple sclerosis, the plaintiff explained that she was tested for MS again, even though the doctors at the University of Connecticut had ruled out an MS diagnosis. (Tr. 47). The plaintiff

elaborated that she would undergo an "EMS" to assess her nerves and muscles in October 2022. (*Id.*). [4]

The plaintiff's attorney later asked about the plaintiff's upcoming testing, during which the plaintiff explained that she also had a nerve conduction test scheduled for October 11, 2022 at Yale. (*Id.* at 52). The purpose of the nerve conduction testing was to assess the plaintiff's nerve system, because although her physicians previously believed her symptoms were linked to inflammation in her spinal cord, they still did not understand why she had no feeling in her legs and hands. (*Id.* at 52-53). The ALJ agreed to keep the record open for four weeks to obtain the results from the testing. (*Id.* at 54).

The ALJ then asked the plaintiff about her mental health. (*Id.*). The plaintiff testified that she had never been hospitalized for mental health reasons, seen a mental health counselor, or been prescribed antidepressant or antianxiety medicine in the past two to three years. (Tr. 46-47). The plaintiff further testified that she did not smoke cigarettes, she had been sober since April 2022, and she did not use substances not prescribed such as marijuana or cocaine. (Tr. 48).

Next, the ALJ inquired about the plaintiff's physical health and capabilities. (*Id.*). The plaintiff confirmed she did not have asthma or COPD. (*Id.*). The plaintiff stated she could walk two blocks before needing to sit down for a while or stop walking. (*Id.*). She explained that her legs "go off on [her]" such that she would not be able to walk back to where she began. (*Id.*). In these instances, the plaintiff stated she would need to stand in place for about half an hour while holding onto something before she could resume walking. (*Id.*). As to the plaintiff's ability to lift and carry, the plaintiff testified that, when she does have strength, she could lift up to ten pounds,

---

[4] The undersigned understands an "EMS" to refer to an esophageal motility study, which measures esophageal strength and muscle coordination when swallowing. *See Esophageal Manometry*, Mayo Clinic (July 9, 2024), https://perma.cc/3Q7X-PC55.

but if she did tasks around her house, such as moving or cooking, she could only lift five pounds. (Tr. 48-49). When the ALJ asked whether she could walk to the back of a Stop & Shop or Wal-Mart, pick up a case of water, and carry it to the cashier, the plaintiff answered that she could not because her legs would not support her by for that period of time, causing her to fall. (Tr. 49). She said that she probably could carry a gallon of milk in that manner. (*Id.*). As to the frequency of the symptoms in her hands, the plaintiff explained that, upon waking up in the mornings, she could move her hands regularly for about two hours. (*Id.*). After two hours, her hands would feel very swollen and tight, making it difficult and painful for her to move them. (*Id.*). She testified that when her hands hurt and she tried to close them or make a first, she felt like her hands "want to explode" such that she must stop and relax for at least one hour before moving her hands again. (Tr. 49-50). Then, even after one hour, the plaintiff stated that she could not use her hands as much as she could at the start of the day because it would be painful. (Tr. 50).

The plaintiff's attorney then further questioned the plaintiff about her physical capabilities. When her attorney asked if she could twist a cap off a bottle of water, the plaintiff explained that she could, but it would take her a long time because her hand would hurt. (*Id.*). The plaintiff stated she could go to the bathroom and brush her teeth on her own but required assistance for other tasks like opening a jar. (Tr. 57-58). Further, the plaintiff confirmed that she used a walker if she no longer had strength in her legs and no one was around to help her. (Tr. 57). She testified that she typically used the walker two or three days per week depending on what she was doing that day. (Tr. 58). She described that she could not use a cane because she would lose her balance when walking, which would cause her to fall. (Tr. 59). She could not go up and down stairs without holding onto something and used the walker primarily for her back problems. (*Id.*).

Regarding her daily activities, the plaintiff testified that she could do little things such as making herself a sandwich, heating up soup, or washing dishes. (Tr. 50). She explained that she could not make food that required constant moving, and she could not kneel on the floor. (*Id.*). Moreover, she avoided sitting or bending down because it hurt her back and she would not be able to get up. (*Id.*). She could not do any yardwork or snow removal, and therefore relied on her son for those tasks. (Tr. 51). However, she could grocery shop online by herself, or in person if one of her children drove her, and the trip did not exceed one hour. (*Id.*). The plaintiff described that, after one hour, "everything starts hurting" and she could not stand up well, such that she must lean on the grocery cart for support, which caused her back pain. (*Id.*). Once she started to feel pain, she would try to get home as soon as possible to lie down. (*Id.*). As to other activities, the plaintiff testified that she did not do any outdoor activities, go out to eat, or go to the movies, she had no hobbies or pets, and she had not left the state of Connecticut in the past two years. (Tr. 51-52).

**B.      The Vocational Expert's Testimony**

Vocational expert Theresa Hopkins also testified at the hearing. (Tr. 59-67). The ALJ first asked Hopkins to classify the plaintiff's work history. Hopkins asked the plaintiff directly to elaborate on the database jobs she held, to which she responded that she handled engineer drawings and designs, entered them into a computer, compared the drawings to each other, and sent them out to other engineers. (Tr. 61). She testified that one of these jobs primarily required standing because the drawings were in a physical binder, while the other job required less standing because the drawings were already in the computer. (Tr. 61-62). Hopkins classified this database work as an engineering clerk, a skilled job that the plaintiff performed sedentary. (Tr. 62). Hopkins classified another one of the plaintiff's previous jobs as an administrative secretary, a skilled job

that she performed sedentary. (*Id.*). Finally, Hopkins classified the casework position that the plaintiff held as an eligibility worker for cases as a skilled job that she performed sedentary. (*Id.*).

The ALJ then presented several hypotheticals and asked Hopkins to opine on the possible substantial gainful activity with the following assumptions: the person would have the plaintiff's age, education, work experience, and capability of working at the light exertional level. (Tr. 62).

First, the ALJ asked Hopkins to opine on the jobs that would be available if the person (1) "could only occasionally lift and carry 20 pounds"; (2) could "frequently lift and carry up to ten pounds"; (3) could "sit, stand, and walk for four hours of an eight-hour workday"; (4) could "sit for six hours of an eight-hour workday"; (5) "could not climb ladders, ropes or scaffolds"; (6) could not tolerate hazards . . . like open, moving machinery, chainsaws . . . and protected heights"; (7) could occasionally climb ramps and stairs"; and (7) could withstand "occasional temperature extremes and frequently finger and handle bilaterally." (Tr. 62-63). Hopkins testified that this individual could perform those jobs if they were sedentary or light, including engineering clerk, administrative secretary, and eligibility worker. (Tr. 63). Hopkins further opined that the individual could perform light unskilled work, including the positions of cashier, router, and assembler of small products. (*Id.*). Hopkins testified that at least some, but not all, of those jobs in the national economy could be performed sitting down. (Tr. 64).

Next, the ALJ asked Hopkins about whether the individual with the same limitations in the hypothetical could perform the jobs Hopkins identified if the individual was completely sedentary. (*Id.*). Hopkins confirmed that they could because the jobs permit the individual to sit at will. (Tr. 64-65). The ALJ then asked Hopkins to identify three sedentary, unskilled jobs that the individual with the same limitations could perform. (Tr. 65). Hopkins identified the jobs of document preparer, table worker, and telephone information clerk. (*Id.*). Working off the same hypothetical

regarding sedentary work, the ALJ altered the hypothetical from frequent fingering and handling to occasional fingering and handling. (*Id.*). Hopkins answered that this individual would not be able to perform the plaintiff's past work, the sedentary jobs Hopkins identified, or the light work jobs. (Tr. 65-66). However, the individual would be able to perform occasional fingering and handling in sedentary unskilled jobs. (Tr. 66).

### C.    <u>Objective Medical Evidence</u>

The relevant issues in this appeal involve the ALJ's findings regarding the plaintiff's fingering and handling capabilities. In formulating the plaintiff's RFC, the ALJ cites to objective medical evidence from her primary care provider, Primary Health, LLC (Ex. 1F); Hartford Hospital (Exs. 3F, 14F); UConn Health (Exs. 6F, 9F); Yale Neuroimmunology Clinic (Ex. 19F); and Yale New Haven Hospital (Ex. 21F).

Beginning in August 2020, the plaintiff went to the emergency department several times because she was experiencing a band-like tightness and pain around her chest, upper abdominal pain, and numbness in her extremities. (Tr. 352 (1F at 24); Tr. 530-532 (3F at 2-4)). The plaintiff was recommended at-home remedies to treat her symptoms and referred for cardiology, neurology, gastroenterology and rheumatology workups. (Tr. 353 (1F at 25); Tr. 542 (3F at 14, 18); Tr. 553 (3F at 26-27); Tr. 638 (3F at 110)). An MRI of the plaintiff's cervical and thoracic spine showed mild degenerative changes, but no evidence of spinal canal stenosis or nerve root compression. (Tr. 585 (3F at 57)).

In April 2021, the plaintiff reported to the emergency department again because her symptoms significantly worsened. (Tr. 703 (3F at 175)). The plaintiff stated that she could not walk due to the numbness and tingling all over her body and had begun using a wheelchair as a result. (Tr. 594, 598 (3F at 66, 70)). After two days of inpatient treatment consisting of IV fluids,

electrolyte replacement, and antibiotics, she was discharged with follow-up instructions but still lacked a clear etiology for her symptoms. (Tr. 597-598 (3F at 70-71)). By September 2021, the plaintiff had stopped using a wheelchair, but her symptoms otherwise persisted. (Tr. 1385 (6F at 6)). In December 2021, the plaintiff was diagnosed with transverse myelitis, which was treated with steroid infusions without significantly alleviating her symptoms. (Tr. 1569 (9F at 10)). The plaintiff obtained an updated MRI of her spine in January 2022, which showed no significant changes. (Tr. 1587 (10F at 8)).

In February 2022, the plaintiff underwent a physical therapy evaluation because she had difficulty walking and experienced decreased strength in her hands and legs. (Tr. 1796 (12F at 5)). She demonstrated decreased range of motion in her shoulders with 4/5 strength, and full range of motion in her lower extremities with 4/5 strength. (Tr. 1800 (12F at 9)).

The plaintiff had subsequent follow-ups throughout 2022 as her symptoms persisted, but she still did not receive a singular diagnosis. In October 2022, after the hearing before the ALJ, the plaintiff underwent a nerve conduction study, which revealed evidence of mild sensory neuropathy affecting the plaintiff's right upper extremity. (Tr. 2694 (21F at 1)).

## III. <u>THE ALJ'S DECISION</u>

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA"). *See* 20 C.F.R. § 404.1520(a).[5] In this case, the ALJ determined that the plaintiff met the insured status requirements under the SSA through December 31, 2025. (Tr. 20).

---

[5] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P,

At Step One, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 29, 2020. (*Id.*).

At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "thoracic spine degenerative disc disease, transverse myelitis, alcohol use disorder, cirrhosis and carpal tunnel syndrome." (*Id.*). The ALJ noted those impairments "significantly limit the [plaintiff's] ability to perform basic work activities as required by SSR 85-28." (*Id.*).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments (the "Listings"). (Tr. 20-21). *See* 20 C.F.R. Part 404, SubPt P, App'x 1. First, the ALJ evaluated the Listings regarding musculoskeletal disorders. *See id.* at § 1.00, *et seq*. The ALJ specifically considered the plaintiff's complaints of pain around her upper abdomen and weakness and numbness in her extremities and determined that those impairments did not meet Listing 1.15 for disorders of the skeletal spine resulting in compromise of a nerve root. (Tr. 20-21).

Second, the ALJ considered the Listings regarding digestive disorders. *See* 20 C.F.R. Part 404, SubPt P, App'x 1, § 5.00 *et seq*. The ALJ specifically considered the plaintiff's complaints of persistent abdominal pain and intermittent nausea and vomiting, and her treatment for ascites.

---

Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80. Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80.

(Tr. 21).  Ultimately, the ALJ determined those impairments did not meet Listing 5.05 for chronic liver disease.

Next, the ALJ formulated the plaintiff's residual functional capacity ("RFC").  A plaintiff's RFC is the most that a claimant can do despite their impairments and is determined by assessing all the relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined the plaintiff had the residual functional capacity to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant cannot climb ladders, ropes and scaffolds.  She can occasionally climb ramps and stairs.  The claimant can occasionally stoop, kneel, crouch, and crawl. She can frequently balance.  The claimant can tolerate exposure to occasional temperature extremes.  She can frequently finger and handle with the bilateral upper extremities.

(Tr. 22).

At Step Four, the ALJ found that the plaintiff could perform her past work as an eligibility worker, administrative assistant and engineering clerk.  (Tr. 27).  As such, the ALJ determined that the plaintiff had not been under a disability since the alleged onset date.  (Tr. 28).  Thus, the ALJ ended the sequential evaluation process at step four and did not proceed to step five.

## IV.    STANDARD OF REVIEW

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  *Brault v. Soc. Sec. Admin.,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence means more than a scintilla, or in other words, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal citation omitted); *see also Wagner v. Sec'y of Health & Hum. Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing denial of DAC, district court may not make *de novo* disability determination). A district court "must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

V.    **DISCUSSION**

The plaintiff raises two arguments in this appeal.  First, the plaintiff maintains that the ALJ's RFC finding is not supported by substantial evidence both because the ALJ found carpal tunnel syndrome to be a severe impairment, notwithstanding that the plaintiff had never been formally diagnosed with carpal tunnel syndrome and because the ALJ failed to find peripheral neuropathy to be either severe or medically determinable.  (Doc. No. 18-1 at 9, 11).  Second, the plaintiff claims the ALJ failed to properly consider the plaintiff's pain in assessing the RFC.  (*Id.* at 13).  The Commissioner challenges both arguments and responds that the ALJ's RFC determination properly reflected the plaintiff's hand functioning in the absence of a definitive diagnosis and that the ALJ properly considered the plaintiff's complaints of pain.  (Doc. No. 20-1 at 4, 7).

For the reasons below, the Court finds that substantial evidence supports the ALJ's decision and therefore remand is not warranted.  In particular, the Court concludes that any error in distinguishing between carpal tunnel syndrome and peripheral neuropathy was harmless, especially in the absence of a definitive diagnosis, because the ALJ appropriately evaluated the objective medical evidence in formulating the plaintiff's RFC. The Court further finds that the ALJ properly considered the plaintiff's complaints of pain.

A.    **The ALJ's Step Two Analysis**

At step two, the ALJ must determine whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities.  *See* C.F.R. § 404.1520(c).  Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or

impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). In other words, "a finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n.2 (1987)). It is the plaintiff's burden to provide "medical evidence which demonstrates the severity of her condition." *Merancy v. Astrue*, No. 3:10cv1982(WIG), 2012 WL 3727262, at *7 (D. Conn. May 3, 2012).

Importantly, "[w]here an ALJ has omitted an impairment from step two of the sequential analysis, other courts have declined to remand if the ALJ clearly considered the effects of the impairment in the remainder of his analysis." *Chavis v. Astrue*, No. 07-CV-0018, 2010 WL 624039, at *12 (N.D.N.Y. Feb. 18, 2020); *Reices-Colon v. Astrue*, 523 Fed. App'x 796, 798 (2d Cir. 2013) (finding error at step two harmless where ALJ considered non-severe impairments during subsequent steps); *Elliott-Sims v. Saul*, No. 3:19-CV-884 (AVC), 2020 WL 13994903, at *7 (D. Conn. Oct. 7, 2020) ("Since the ALJ did not deny benefits at step two, and instead found some impairments severe and continued with the five-step evaluation process, the ALJ did not commit an error warranting remand by failing to find these conditions severe impairments at step two."); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012) ("At step two, if the ALJ finds an impairment is severe, the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." (internal quotations and citation omitted)).

In this case, the ALJ determined that the claimant had the following severe impairments: "thoracic spine degenerative disc disease, transverse myelitis, alcohol use disorder, cirrhosis and

carpal tunnel syndrome."  (Tr. 20).  The plaintiff's principal argument is that the ALJ's error at step two is twofold: first, the ALJ found that the plaintiff suffered from carpal tunnel syndrome despite the absence of any provider opinion that she had this condition, and second, the ALJ did not find that the plaintiff suffered from peripheral neuropathy or chronic pain syndrome either as a medically determinable impairment or as a severe impairment.  (Doc. No. 18-1 at 9-11).  The plaintiff claims that the ALJ's error at step two resulted in a flawed RFC assessment, such that remand is necessary because there is no "logical bridge" connecting the evidence to the ALJ's RFC assessment.  (*Id.* (quoting *Battaglio v. Comm'r of Soc. Sec.*, 3:21-cv-01460-JCH, at 16 (D. Conn. Mar. 7, 2023))).

The Commissioner argues that the ALJ fully accounted for the plaintiff's manipulative limitations in the RFC by limiting the plaintiff to no more than frequent fingering.  (Tr. 22). Specifically, the Commissioner claims that the ALJ noted the plaintiff's "physical examinations were generally unremarkable, she engaged in only conservative treatment, electrodiagnostic testing showed only mild neuropathy affecting the right upper extremity, and she displayed full motor strength with normal fine finger movements."  (Doc. No. 20-1 at 4 (citing Tr. 23-25)).

Here, the ALJ properly assessed the plaintiff's impairments at step two.  First, the ALJ did not err by categorizing the plaintiff's nerve impairments as carpal tunnel syndrome rather than peripheral neuropathy.  Peripheral neuropathy is nerve damage anywhere in the body outside the brain and spinal cord characterized by numbness, prickling, or tingling.  *See Peripheral Neuropathy*, Mayo Clinic (Sept. 2, 2023), https://perma.cc/ZXW2-94W3.  Mononeuropathy is peripheral neuropathy that affects one nerve, while polyneuropathy is peripheral neuropathy that affects many nerves.  *Id.*  Carpal tunnel syndrome is a type of mononeuropathy and is limited to numbness or tingling in the hands only.  *See id.*; *Carpal Tunnel Syndrome*, Mayo Clinic (Feb. 6,

2024), https://perma.cc/CZN6-KQXZ.   In other words, carpal tunnel syndrome is a form of peripheral neuropathy.  *See Ruth M. v. Saul*, No. 5:18-CV-01006 (FJS/CFH), 2020 WL 819323, at *6 (N.D.N.Y. Feb. 19, 2020), *report and recommendation adopted*, No. 519CV1006FJSCFH, 2020 WL 1245404 (N.D.N.Y. Mar. 16, 2020) ("[The plaintiff's] diagnoses of bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, and bilateral tarsal syndrome constitute diagnoses of peripheral neuropathy.").

Second, the plaintiff's symptoms were notably of unclear etiology.  The ALJ noted as much numerous times (Tr. 22-24, 26), and the plaintiff herself testified at the hearing before the ALJ about the difficulty in receiving a clear diagnosis.  (Tr. 42 ("Well, whatever I have, transverse myelitis or whatever they decided that I have, it's affecting my—from my chest all the way to my legs and my hands."); Tr. 45 ("I was going back and forth with the hospital . . . and they couldn't figure out what I had, so I am not even sure that what they thought that it is right now . . . ."); Tr. 46 ("[W]ell, before they said it was an inflammation of my spinal cord, which it was . . . Now they're saying it might not be that so they're trying to do another test . . . ."); Tr 47 ("They're going to try to see if [multiple sclerosis] will be the case because they ruled it out in UConn but because I'm having what I'm having on my legs and hands they can't really explain it, so that's why they're doing the test again to see, to make sure that it's not [multiple sclerosis].")).  While the record does not show that the plaintiff herself described her symptoms as carpal tunnel syndrome, her counsel previously stated in his brief to the Appeals Council, "[t]he claimant also suffers from bilateral carpal tunnel." (Tr. 326 (17E at 3)).

Third, although the medical record contains subjective complaints of numbness and tingling, and some intermittent episodes of decreased strength in her upper and lower extremities, the Commissioner correctly notes that the plaintiff consistently demonstrated normal fine motor

function.[6]  *See* (Tr. 2588 (17F at 4) ("[F]ine finger movements normal)"; Tr. 2640 (Ex. 19F) ("Normal fine finger movements bilaterally. Strength was effort dependent but appeared full throughout.")).  Several examinations at UConn Health from March 2021 through April 2022 showed the plaintiff's motor function was normal.  *See* (Tr. 778 (4F at 25); Tr. 1127 (5F at 61); Tr. 1150 (5F at 81); Tr. 1388 (6F at 9); Tr. 2210 (16F at 294)).[7]  Based on these assessments, medical sources did not impose functional limitations based on her fine motor function.  For example, Dr. Choi examined the plaintiff in April 2021 and July 2021 and observed decreased strength in her upper extremities. (Tr. 773, 791).  However, he did not impose any limitations in fingering or handling.  Nevertheless, the ALJ limited the plaintiff to no more than frequent fingering and handling with her bilateral upper extremities. In other words, the ALJ found that the plaintiff could only engage in fingering and handling one-third to two-thirds of the time, which is a limitation.[8]  Moreover, the ALJ specifically considered the updated records the plaintiff submitted at the hearing level, which were not available to the State Agency consultants at the time of their assessments. These updated records showed that the plaintiff had increasing symptoms in her hands and supported manipulative limitations.  (Tr. 27).

Finally, because the ALJ proceeded past step two and considered all the plaintiff's impairments in the remainder of the sequential analysis, any error in finding that the plaintiff's manipulative limitations were not the result of a separate severe impairment was harmless.  *See*

---

[6] The Commissioner cites page 2258 in its motion, but it is page 2588 of the transcript in Exhibit 17F, from the plaintiff's August 9, 2022 visit to the Yale Neuromuscular Clinic, that states "fine finger movements normal."  (Tr. 2588 (17F at 4)).

[7] The Commissioner cites numerous pages of the transcript, but many of these references cite to the same visit and are not, in fact, unique assessments of the plaintiff's motor function.  For example, pages 778, 1091 and 1632 of the transcript all reflect Dr. Dimaandal's notes from June 4, 2021; pages 814, 1127 and 1667 all reflect Dr. Dimaandal's notes from March 4, 2021; and pages 1388 and 1610 both reflect Dr. Nalamada's notes from September 29, 2021.

[8] "'Frequent' means occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251 (Jan. 1, 1983).

*Elliott-Sims*, 2020 WL 13994903, at *8; *Reices-Colon*, 523 F. App'x at 798.  At step two, the ALJ identified other severe impairments besides peripheral neuropathy and chronic pain, including "thoracic spine degenerative disc disease, transverse myelitis, alcohol use disorder, cirrhosis, and carpal tunnel syndrome," and proceeded with the subsequent steps of the analysis.  (Tr. 20).  In those subsequent steps, the ALJ specifically considered the plaintiff's manipulative abilities. The ALJ examined all the medical records, including the plaintiff's repeated complaints of pain and numbness throughout her body and visits to the emergency room.  (Tr. 22-24).  The ALJ considered that the plaintiff's "upper extremity symptoms have been related to findings of sensory neuropathy affecting the right upper extremity," (Tr. 23) and noted "abnormal movements in all extremities."  (Tr. 24).  Further, the ALJ detailed the plaintiff's repeated neurological, rheumatological, and hematological work ups, which revealed some decreased strength in her upper and lower extremities but generally showed "unremarkable findings."  (Tr. 25).  Despite repeated evaluations throughout 2022 showing normal fine finger movements, full motor strength, and "no striking neuropathy findings or significant abnormalities on electrodiagnostic testing," the ALJ nevertheless limited the plaintiff to no more than frequent fingering and handling because of her "consistent and persistent reports of band-like chest/upper abdominal pain as well as weakness and numbness in the upper and lower extremities."  (Tr. 26).  Therefore, the ALJ considered all impairments, whether severe or not, in the remaining steps. Accordingly, the ALJ's failure to identify peripheral neuropathy or chronic pain as severe impairments was harmless.

A review of the entire decision indicates the ALJ's step two finding was supported by substantial evidence and that the ALJ properly considered the plaintiff's manipulative limitations in the remainder of the sequential analysis.  Thus, remand is not warranted on the ground that the ALJ erred at step two.

B.    <u>The ALJ's Credibility Determination</u>

A claimant's subjective complaints are "an important element in the adjudication of [Social Security] claims, and must be thoroughly considered in calculating the RFC of a claimant." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). When assessing a claimant's RFC, "the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted). "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Off. of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotations and citation omitted).

An ALJ must follow a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce [the plaintiff's] symptoms, such as pain." 20 C.F.R. § 404.1529(b); *Genier*, 606 F.3d at 49. "[S]ubjective assertions of pain *alone* cannot ground a finding of disability." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(a)). Second, if the claimant does suffer from such an impairment, the ALJ must assess the claimant's credibility regarding "the intensity and persistence of [the claimant's] symptoms," to assess how those symptoms limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c). The ALJ may not reject statements "about the intensity and persistence of [the claimant's] pain or other symptoms or about the effect [those] symptoms have on [the claimant's] ability to work solely because the objective medical evidence does not substantiate [the claimant's] statements." *Id.* § 404.1529(c)(2). Rather, the ALJ must consider factors relevant to the claimant's symptoms

21

of pain, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain and other symptoms; (3) any precipitating or aggravating factors; (4) the effect of any medication taken to alleviate the symptoms; (5) any other treatment the claimant has received for symptom relief; (6) any other measures the plaintiff has used to relieve symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to their pain.  20 C.F.R. § 404.1529(c)(3)(i-viii); *Poole v. Saul*, 462 F. Supp. 3d 137, 157 (D. Conn. 2020).

In this case, the plaintiff argues the ALJ did not properly consider the plaintiff's pain in determining her RFC because the ALJ failed to find that the plaintiff had "peripheral neuropathy with chronic pain syndrome secondary thereto."  (Doc. No. 18-1 at 13 (citing (Tr. 2622-2624))). As a result, the plaintiff argues that the ALJ's "failure to find a condition known to produce chronic pain in the hands and wrists" meant the ALJ had to do more than "merely cit[e] to the clinical or subjective evidence with the record, as the basis for the rejection of the subjective complaints." (*Id.* at 15).  In other words, the plaintiff argues that the ALJ's failure to find that the plaintiff suffered from peripheral neuropathy, which caused the plaintiff chronic pain, meant the ALJ was required to provide a more fulsome explanation for discrediting the plaintiff's subjective complaints.  The Commissioner responds that the plaintiff's complaints were not supported by the underlying medical records and that the medical sources did not impose any limitations related to her fine motor function.  (Doc. No. 20-1 at 7-8).

The Court finds that the ALJ adequately considered the plaintiff's complaints of pain.  As discussed in detail below, the ALJ considered the plaintiff's complaints of pain throughout his decision (Tr. 22-26) and credited some of those complaints by limiting the plaintiff to sedentary work without the ability to climb ladders, ropes, and scaffolds, and only frequent fingering and

handling. (Tr. 22). Although the ALJ did not entirely credit the plaintiff's complaints of pain, the ALJ nevertheless appropriately considered these complaints in light of the factors in 20 C.F.R. § 404.1529(c)(3)(i-viii).

First, the ALJ found the plaintiff had the following severe, medically determinable impairments: "thoracic spine degenerative disc disease, transverse myelitis, alcohol use disorder, cirrhosis and carpal tunnel syndrome." (Tr. 20). The ALJ then found that those medically determinable impairments could reasonably be expected to cause the plaintiff's alleged symptoms, but that the plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 23). Considering first the objective medical evidence, the ALJ discussed the plaintiff's numerous visits to the emergency department and follow up appointments since August 2020, but "[p]hysical examinations were generally unremarkable and work ups were negative." (Tr. 23-24); *see also* (Tr. 778 (4F at 25); Tr. 1127 (5F at 61); Tr. 1150 (5F at 81); Tr. 1388 (6F at 9); Tr. 2210 (16F at 294)). The ALJ then described the plaintiff's extensive treatment history through 2022, including spinal cord imaging, some improvement with medication, the plaintiff's brief use of a wheelchair between April and June 2021, and electrodiagnostic testing revealing mild sensory neuropathy affecting her right upper extremity. (Tr. 23-24); *see also* (Tr. 440 (2F at 45); Tr. 585 (3F at 57); Tr. 774 (4F at 21); Tr. 2694 (21F at 1)).

The ALJ discussed five of the factors set forth in 20 C.F.R. § 404.1529(c)(3)(i-viii). Beginning with the plaintiff's daily living activities, the ALJ considered how, on a typical day, the plaintiff could get up, eat, and perform light chores such as washing dishes and showering. (Tr. 26). The plaintiff had no problem with personal care, although it took her longer than before the onset of her symptoms, and she was able to prepare simple meals for herself, including sandwiches,

canned soup, and frozen meals.  (*Id.*).  While the plaintiff's children helped her with more demanding chores such as yard work, the plaintiff grocery shopped online by herself.  (*Id.*).

As to the location, duration, frequency, and intensity of the plaintiff's pain and other symptoms, the ALJ discussed throughout his opinion the plaintiff's complaints of pain and numbness across her chest and in her hands and feet.  (Tr. 22-24).  The ALJ noted the plaintiff used a wheelchair for about two months between April and June 2021 because she was unable to ambulate independently during that time.  (Tr. 22-23).

As to the effects of medication taken to alleviate any symptoms, the ALJ described how the plaintiff initially "reported some improvement of her symptoms with various medications," but later reported no side effects and no significant improvement of her symptoms.  (Tr. 24).

As to other treatments to alleviate symptoms, the ALJ discussed the plaintiff's repeated admissions to the emergency department, workups with various departments, and recommendations for conservative treatment and physical therapy.  (Tr. 24-25).

As to other measures the plaintiff used to relieve her symptoms, the ALJ noted the plaintiff's change in alcohol consumption.  When the plaintiff initially began experiencing symptoms in 2020, her abdominal complaints were thought to be related to alcohol abuse, although her symptoms persisted even when she abstained from alcohol.  (Tr. 22).  However, in 2022, when a liver biopsy showed signs of steatohepatitis, the plaintiff was counseled on abstaining from alcohol and maintaining a healthy diet.  (Tr. 26).  The ALJ noted the plaintiff "subsequently abstained from alcohol with gradual improvement of her liver function."  (*Id.*).

Consequently, the ALJ concluded that, "[w]hen considered with the clinical findings and treatment history above, the claimant's self-reported activities of daily living generally support a

conclusion that she is capable of performing work within the limitations established in [the plaintiff's RFC]." (*Id.*).

Notably, the ALJ found the plaintiff suffered from carpal tunnel syndrome, a severe, medically determinable impairment similar to peripheral neuropathy. *See Ruth M.*, 2020 WL 819323, at *6 n.4 ("[C]arpal tunnel syndrome is an example of mononeuropathy—a form of peripheral neuropathy."). Carpal tunnel syndrome is, by definition, characterized by "weakness, pain, and disturbances of sensation in the hand and fingers." *Hailoo v. Disabiliy RMS*, No. 14-CV-1992(ADS)(ARL), 2015 WL 7575906 (E.D.N.Y. Nov. 25, 2015) (quoting *Merriam-Webster's Medical Dictionary*, Carpal Tunnel Syndrome, https://perma.cc/E8F3-5NSA (last visited Jan. 3, 2025)). Therefore, the plaintiff is not correct that the ALJ's failure to find peripheral neuropathy as a severe impairment necessarily meant the ALJ failed to adequately consider the plaintiff's complaints of pain.

Moreover, the limitations imposed in the RFC confirm that the ALJ adequately considered the plaintiff's complaints of pain. The plaintiff testified that she could generally only move her hands regularly for about two hours at the beginning of the day before they begin to feel very swollen and painful. (Tr. 49). Then, even after resting her hands for one hour, she stated she could not use her hands as much as she could at the start of the day because it would be painful. (Tr. 50). The plaintiff further testified that it would hurt to twist a cap off a bottle of water, and she would require assistance to open a jar. (*Id.*). She also avoided sitting or bending down because it hurt her back and she would not be able to get up. (*Id.*). Finally, the plaintiff explained that she could not stand for more than one hour because "everything starts hurting." (Tr. 51). The ALJ's RFC adequately reflects these complaints.

Specifically, the ALJ limited the plaintiff to sedentary work without the ability to climb ladders, ropes, or scaffolds. (Tr. 22). The ALJ also found that the plaintiff could only occasionally stoop, kneel, crouch, and crawl; frequently balance; occasionally tolerate temperature extremes; and frequently finger and handle with the bilateral upper extremities. (*Id.*). Because "occasional" means up to one-third of the time and "frequent" means between one-third and two-thirds of the time, s*ee* SSR 83-10, 1983 WL 31251 (Jan. 1, 1983), the ALJ did partially credit the plaintiff's testimony by imposing limitations in the RFC. The ALJ thus properly considered the consistency of the plaintiff's subjective complaints with the other evidence of record. The ALJ also had the opportunity to personally observe the plaintiff and her testimony to assess her credibility, which is owed great deference. *See Pietrunti*, 119 F.3d at 1042. Accordingly, the Court finds no error in the ALJ's assessment of the plaintiff's credibility.

## VI.    <u>CONCLUSION</u>

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 18) is **DENIED**. The Commissioner's motion to affirm that decision (Doc. No. 20) is **GRANTED**. The Clerk shall enter judgment and close this case.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. See 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 3rd day of January 2025, at New Haven, Connecticut.

/s Robert M. Spector
Robert M. Spector,
United States Magistrate Judge